DELTA AIR LINES, INC., Allegheny Airlines, Inc., National Airlines, Inc., Piedmont Aviation, Inc., Braniff Airways, Inc., North Central Airlines, Inc., Southern Airways, Inc., Eastern Air Lines, Inc., Northwest Airlines, Inc., Trans World Airlines, Inc., Ozark Air Lines, Inc., American Airlines, Inc., Pan American World Airways, Inc., and United Air Lines, Inc., Plaintiffs,

v.

Werner J. KRAMARSKY, Individually and in his capacity as Commissioner of the New York State Division of Human Rights; Ann Thacher Anderson, Individually and in her capacity as General Counsel of the New York State Division of Human Rights; the New York State Division of Human Rights, an agency of the Executive Department of the State of New York; Arthur Cooperman, Individually and in his capacity as Chairman of the New York State Workmen's Compensation Board; and the New York State Workmen's Compensation Board, Defendants.

No. 77 Civ. 3358 (MEL).

United States District Court,
S. D. New York.

Jan. 28, 1980.

Seward & Kissel, New York City and Atlanta, Ga., for plaintiffs; Dean Booth, J. Stanley Hawkins, Atlanta, Ga., of counsel.

Robert Abrams, Atty. Gen. of the State of New York, State Division of Human Rights, New York City, for defendants; Judith T. Kramer, Arnold D. Fleischer, Asst. Attys. Gen., New York City, Ann Thacher Anderson, New York City, of counsel.

LASKER, District Judge.

Fourteen airlines operating in New York State seek declaratory and injunctive relief from the application of two New York statutes which would require them to provide complete coverage in their employee benefit plans for disabilities related to pregnancy.

The statutes in question are the Human Rights Law (HRL), N.Y.Exec.Law §§ 290–301 (McKinney 1976), and the Disability Benefits Law (DBL), N.Y.Work.Comp.Law §§ 200–242 (art. 9) (McKinney Supp.1972–1978). In December of 1976, the New York Court of Appeals held in *Brooklyn Union Gas Co. v. New York State Human Rights Appeal Board*, 41 N.Y.2d 84, 390 N.Y.S.2d 884, 359 N.E.2d 393 (1976), that the prohibition against sex discrimination contained in § 296.1(a) of the HRL bars private employers from treating pregnancy and childbirth differently from any other physical disability. On August 3, 1977, the New York Disability Benefits Law was amended to expand the definition of disability to include disabilities related to pregnancy. See N.Y.Work.Comp.Law §§ 201(9)(B) and 205(3). The statutes therefore require in-clusion of pregnancy benefits in any employee benefit plan of general coverage maintained for employees in New York.

The airlines contend that the two statutes are preempted from regulating the employee plans in question by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1381 (1976 & Supp. I, 1977), and by the Railway Labor Act (RLA), 45 U.S.C. §§ 151–188 (1976). They also argue that the effect of including complete pregnancy coverage in their plans would be to increase the compensation of their female employees beyond that paid to their male employees in violation of the "equal pay for equal work" doctrine of Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e–17 (1976), the Equal Pay Act, 29 U.S.C. § 206(d) (1976), and Executive Order No. 11246, 3 C.F.R. 339 (1964–1965 Comp.) (Sept. 24, 1965), as amended by Executive Order No. 11375, 3 C.F.R. 684 (1966–1970 Comp.) (Oct. 13, 1967).

The State moves under Rule 12(b)(6), Fed.R.Civ.P., to dismiss for failure to state a claim upon which relief can be granted.

### Developments in the Law Since the Action Was Filed

The stakes involved in this case were considerably narrowed when, in October of 1978, § 701 of Title VII was amended to provide that:

"women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work . . . . ."

Pub.L. No. 95–555, § 1, 92 Stat. 2076 (codified at 42 U.S.C. § 2000e(k)) (the "Pregnancy Disability Act"). The effect of the amendment is to require employers, such as those suing here, to include pregnancy disabilities in their employee benefit plans. Thus the airlines' claims for relief are rendered moot from the effective date of the statute. Accordingly, what remains for de-

cision is the question whether the New York statutes may validly be applied to the airlines' plans from the date upon ·which state law was first interpreted in *Brooklyn Union Gas* to require such plans to provide benefits for pregnancy related disabilities (December 20, 1976) until the effective date of the new federal law (April 29, 1979).

## I. The Airlines' Standing to Sue

■ The State contends that the airlines lack standing to assert that the rights of their male employees are violated by the two state statutes. It relies on *Gilbert v. General Electric Co.*, 59 F.R.D. 267 (E.D.Va. 1973), which, according to the State, stands for the proposition that an employer who has approved an allegedly discriminatory bargaining agreement cannot seek to represent employees who are aggrieved by the discrimination.

Even assuming that the State has properly interpreted *Gilbert,* that case appears to have no bearing on the issue here. The airlines are not attacking the terms of the collective bargaining agreement in any way; rather, they are defending them from allegedly unconstitutional interference by the State.

A number of recent decisions dealing with the right of an employer to sue on behalf of his employees appear to establish clearly the standing of the airlines here. The two state statutes impose significant obligations on the airlines themselves. Compliance with the statutes will subject them to substantial economic burdens; failure to comply could lead to sanctions from the State. Accordingly, the airlines face a sufficient risk of "injury in fact" to permit them to contest the state law. *Carey v. Population Services International,* 431 U.S. 678, 682–84, 97 S.Ct. 2010, 2014–15, 52 L.Ed.2d 675 (1977); *Craig v. Boren,* 429 U.S. 190, 192–97, 97 S.Ct. 451, 454–56, 50 L.Ed.2d 397 (1976). Moreover, the resources which the airlines command—as well as their stake in the result—assure that they will be effective advocates on behalf of their male employees. *See Singleton v. Wulff,* 428 U.S. 106, 112–17, 96 S.Ct. 2868, 2873–75, 49 L.Ed.2d 826 (1976).

## II. ERISA Preemption

### Human Rights Law

■ The statutory language, legislative history and controlling case law all indicate that the HRL is preempted by ERISA.

Section 514(a) of ERISA provides that the federal statute "shall supersede any and all State laws *insofar as they may now or hereafter relate to any employee benefit plan* described in section 1003(a) of this title." 29 U.S.C. § 1144(a) (emphasis added). Section 514(c)(2) defines "State" to include "a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, *directly or indirectly,* the terms and conditions of employee benefit plans covered by this subchapter." 29 U.S.C. § 1144(c)(2) (emphasis added). The only state statutes excluded from the operation of the preemption clause are those regulating insurance, banking, or securities, or generally applicable state criminal law. *See* 29 U.S.C. § 1144(b).

The legislative history of ERISA strengthens the conclusion that the scope of the preemption clause is fully as broad as its language suggests. Both the House and Senate Conference Committees rejected earlier versions of the clause which would have limited preemption to areas of specific conflict between state and federal law. Thus, the House version originally would have superseded state laws only "insofar as they may now or hereafter relate to the reporting and disclosure responsibilities, and fiduciary responsibilities, of persons acting on behalf of any employee benefit plan . . . .," 120 Cong.Rec. 4742 (1974), while the Senate version would have superseded state laws only "insofar as they may now or hereafter relate to the subject matters regulated by this Act . . . .," 120 Cong.Rec. 5002 (1974). Instead of adopting one of these narrow provisions, Congress opted for broad preemption language. According to Senator Javits, the ranking minority member of the Senate Committee on Labor and Public Welfare, this action was taken to avoid the possibility of:

"endless litigation over the validity of State action that might impinge on Federal regulation, as well as opening the door to multiple and potentially conflicting State laws hastily contrived to deal with some particular aspect of private welfare or pension benefit plans not clearly connected to the Federal regulatory scheme."

120 Cong.Rec. 29942 (1974).

The sponsors of the bill in both the House and the Senate also described the scope of the clause in sweeping terms. Senator Harrison Williams, the Senate sponsor, stated during his presentation of the bill that, with the narrow exceptions specified in the bill, the preemption principle "is intended to apply in its broadest sense to all actions of State or local governments, or any instrumentality thereof, which have the force or effect of law." 120 Cong.Rec. 29933 (1974). Similarly, Congressman John Dent, the House sponsor, stated that the "crowning achievement" of ERISA was its reservation to the federal government of the sole power to regulate the field of employee benefit plans:

> "The conferees, with the narrow exceptions specifically enumerated, *applied this principle in its broadest sense to foreclose any non-Federal regulation of employee benefit plans.* Thus, the provisions of section 514 would reach any rule, regulation, practice or decision of any State, subdivision thereof or any agency or instrumentality thereof—including any professional society or association operating under color of law—*which would affect any employee benefit plan* as described in section 4(a) and not exempt under section 4(b)."

120 Cong.Rec. 29197 (1974) (emphasis added).

Despite this evidence of the broad impact of ERISA preemption, the State argues that both the language of the statute and its legislative history establish that Congress did not intend to preempt state antidiscrimination law. It points out that, during the congressional debate over ERISA, members of both the House and Senate were dissuaded from including an antidiscrimination clause in the statute because they were assured by the sponsors of the bill that Title VII would continue to bar discrimination in employee benefit plans.[1] Moreover, the State notes that § 514(d) of ERISA, 29 U.S.C. § 1144(d), provides that nothing in ERISA modifies existing *federal* law[2] and that § 708 of Title VII, 42 U.S.C. § 2000e–7, provides that Title VII does not exempt any person from the requirements of state anti-discrimination law.[3] Accordingly, the State argues that (1) since ERISA does not preempt nonconflicting federal law, and (2) since Title VII permits enforcement of state law, then (3) ERISA, like Title VII, does not preempt nonconflicting state law.

Although several courts have adopted the State's "double savings" theory in analyzing the effect of ERISA's preemption clause on state anti-discrimination law, see *Bucyrus-Erie Co. v. Department of Industry, Labor and Human Relations*, 453 F.Supp. 75 (E.D. Wis.1978), aff'd 599 F.2d 205 (7th Cir. 1979); *Liberty Mutual Insurance Co. v. State Division of Human Rights*, 61 App.Div.2d 822, 402 N.Y.S.2d 218 (2nd Dept.), *appeal denied*, 44 N.Y.2d 644, 405 N.Y.S.2d 1028, 377 N.E.2d 488 (1978); *Goodyear Tire & Rubber Co. v. Department of Industry, Labor and Human Relations*, 20 FEP Cases 1789 (BNA) (Cir.Ct. Dane Co. Feb. 7, 1978), *aff'd*,

1. *See* 119 Cong.Rec. (pt. 23) 30,409–10 (Sept. 19, 1973); 120 Cong.Rec. (pt. 4) 4726 (Feb. 28, 1974).

2. "Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States (except as provided in sections 1031 and 1137(b) of this title) or any rule or regulation issued under any such law." 29 U.S.C. § 1144(d).

3. "Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter." 42 U.S.C. § 2000e–7.

87 Wis.2d 56, 273 N.W.2d 786 (Ct.App. Dist. IV, 1978), the Second Circuit appears to have rejected it. In *Pervel Industries, Inc. v. State of Connecticut Commission on Human Rights and Opportunities*, 468 F.Supp. 490 (D.Conn.1978), aff'd, 603 F.2d 214 (2d Cir., 1979), the District Court (Newman, J.) held that ERISA preempted Connecticut's anti-discrimination law insofar as it required inclusion of pregnancy benefits in employee benefit plans. Judge Newman made this straightforward analysis of the preemption clause:

> "Section 514(a) of ERISA, 29 U.S.C. § 1144(a), provides that the provisions of subchapter I, concerning protection of employee benefit rights, 'shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . .' The broad sweep of this language and the deliberate Congressional intention to accomplish broad preemption has recently been reviewed by this Court. *National Carriers' Conference Committee v. Heffernan*, 454 F.Supp. 914 (D.Conn.1978). It was there pointed out that Congress made a clear-cut decision not to identify various subjects on which state laws were to be preempted, but instead sought to avoid constant litigation over the scope of preemption by preempting, with certain specific exemptions, 'all' state laws insofar as they 'relate' to plans covered by ERISA. Plainly Connecticut's anti-discrimination law, legislating specifically on the subject of disability benefits, is a law that relates to an employee benefit plan."

*Id.* at 491–92. Judge Newman explicitly rejected the double savings clause argument, and held that § 514(d) should be interpreted literally to apply only to federal law. *Id.* at 493.

The decision in *Pervel* was affirmed in a brief *per curiam* opinion by the Second Circuit, 603 F.2d 214 (1979), in which the Court ruled:

"This case arose before the amendment of Title VII in October 1978 by the Pregnancy Disability Act, Pub.L. No. 95–555, 92 Stat. 2076 (codified at 42 U.S.C. § 2000e(k)). At that time state statutes, except those specifically excluded, were preempted by ERISA 'insofar as they may now or hereafter relate to any employee benefit plan.' 29 U.S.C. § 1144(a). The Connecticut Statute is subject to preemption for the reasons stated in Judge Newman's opinion, 468 F.Supp. 490.

We therefore affirm on that opinion, which generally sets forth our own views."

■ The State contends that *Pervel* is distinguishable because the Connecticut statute applied, by its own terms, to disability benefit plans while the Human Rights Law does not. However, this distinction does not appear to make a difference. The New York Court of Appeals has interpreted the HRL to do exactly what the Connecticut law does on its face. See, e. g., *Brooklyn Union Gas Co. v. New York State Human Rights Appeal Board*, 41 N.Y.2d 84, 86, 390 N.Y.S.2d 884, 886, 359 N.E.2d 393, 395 (1976). Moreover, § 514(c) of ERISA, which defines what state laws are preempted by the statute, provides:

"(c) For purposes of this section:

(1) The term 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State. . . .

(2) The term 'State' includes a State, any political subdivisions thereof, or any agency or instrumentality of either which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter."

29 U.S.C. § 1144(c). Thus *Pervel* appears squarely on point with the anti-discrimination law involved here and vindicates the airlines' position.[4]

---

4. The State argues that American Airlines' causes of action are barred because American was a party to *Brooklyn Union Gas Co. v. New York State Human Rights Appeal Board*, 41 N.Y.2d 84, 390 N.Y.S.2d 884, 359 N.E.2d 393 (1976). But American's involvement in that case arose out of a complaint against it filed with the State Division of Human Rights by an employee who was denied benefits for her 1972 pregnancy. *See American Airlines, Inc. v.*

### The Disability Benefits Law

This leaves the question whether the other state statute, the DBL, is preempted by ERISA. It should be noted that, as pointed out above, the DBL has applied to pregnancy benefits for a shorter period of time than the HRL. Whereas the HRL was interpreted to require inclusion of pregnancy benefits in employee plans in December of 1976, the DBL amendments went into effect only on August 3, 1977. Moreover, the DBL requires employee benefit plans to pay disability benefits for pregnancy for only eight weeks, except when the disability is the result of a complication during pregnancy. N.Y.Work.Comp.Law § 205(3).

As noted above, § 514(b) of ERISA, 29 U.S.C. § 1144(b), excludes certain state laws (insurance, banking, etc.) from the coverage of its preemption clause. Section 4(b) of ERISA excludes certain employee benefit *plans* from the coverage of the statute altogether. In particular, section 4(b)(3) excludes from ERISA any plan

> "maintained solely for the purpose of complying with applicable workmen's compensation laws or unemployment compensation *or disability insurance laws.*"

29 U.S.C. § 1003(b)(3) (emphasis added). The question therefore naturally exists whether the DBL is not excluded from the statute by the very terms of ERISA. Since the original briefs on the motion to dismiss were submitted prior to the amendment of the DBL, we requested supplemental briefs on this point.

The airlines argue that section 4(b)(3) should be interpreted to apply literally to plans maintained "solely" to comply with state disability insurance laws. They point out that section 4(b) appears to exclude from ERISA entire *plans* which are maintained to comply with state disability laws rather than individual provisions. Accordingly, they argue that the section is intended to apply to plans which are maintained only to meet the minimum requirements of state law, such as plans maintained by small, intrastate employers, in which the types of abuses that ERISA is designed to avoid are minimal. Any other interpretation would, in their view, lead to the unlikely result of removing their plans from the operation of ERISA.

The State contends, on the other hand, that the congressional purpose behind the "exclusionary sections" of ERISA was to "permit the expression of State policy *with regard to those provisions* of employee benefit plans pertaining directly to the requirements of" each state's workmen's compensation laws. (Supp.Mem. of April 19, 1978 at 2) (emphasis added) The sole reason the airlines would amend their plans to include pregnancy benefits now, the State continues, would be to comply with the new DBL amendments. Thus that part of their plans which would provide pregnancy benefits would be "maintained solely" to comply with the state law and therefore fall squarely within the exclusion of section 4(b)(3).

 The legislative history on this point is characteristically unilluminating. Nor is there any case law directly on point. As a matter of common sense, however, the State appears to have the better of the argument. For example, section 4(b)(3) indicates a tolerance of state workmen's compensation laws. However, if the airlines' interpretation of the provision were adopted, unreasonable conflicts would exist between the treatment of workmen's compensation not subject to ERISA laws and other employee benefit plans subject to ERISA. Thus any attempt by a state to impose the requirements of its workmen's compensation laws on an employee benefit plan would result in the wholesale exclusion of that plan from ERISA. Alternatively, the

---

*State Human Rights Appeal Board,* 50 App. Div.2d 450, 378 N.Y.S.2d 697 (1st Dept.), *rev'd,* 41 N.Y.2d 84, 390 N.Y.S.2d 884, 359 N.E.2d 393 (1976). Since ERISA did not become effective until January 1, 1975, American could not have argued in *Brooklyn Union Gas* that the claim against it was void because ERISA preempted the provisions of the HRL underlying that claim. Accordingly, American's participation in that case does not bar it from urging here that those provisions of the HRL have since been preempted.

state would be limited to applying its law to only a smattering of small, local employers while any employer whose plan was not maintained solely to comply with state law would escape the operation of the workmen's compensation laws altogether. The interpretation provided by the State is more practical and persuasive; that is, that ERISA and state workmen's compensation laws create independent and concurrent obligations and that those provisions of an employee plan which are maintained to comply with such state laws are excluded from ERISA.

Accordingly, we conclude that application of the DBL in this case is not barred by ERISA.

### III. Preemption by the Railway Labor Act

■ The airlines contend that the Railway Labor Act, 45 U.S.C. §§ 151–188, (to which the airlines are subject under 45 U.S.C. § 181) preempts the DBL from altering the terms of collectively bargained employee benefit plans.

The classic concern of federal labor law preemption is to prevent the states from interfering with the process by which an employer and his employee negotiate a collective bargaining agreement. Thus, the Supreme Court held in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959), that:

> "When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law."

The airlines argue that "[I]f states are preempted from influencing the collective bargaining *process, a fortiori*, states should be preempted (with certain limitations) from

dictating the *terms* of the agreement which would otherwise be the product of that process." (Memorandum in Opposition at 57–58) They note the Supreme Court's statement in *Lodge 76, International Association of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 153, 96 S.Ct. 2548, 2559, 49 L.Ed.2d 396 (1976) that:

> "Our decisions since *Briggs-Stratton* have made it abundantly clear that state attempts to influence the substantive terms of collective-bargaining agreements are as inconsistent with the federal regulatory scheme as are such attempts by the NLRB."

The airlines rely in particular on two Supreme Court decision in which states were prohibited from influencing negotiated wage rates. In *California v. Taylor*, 353 U.S. 553, 77 S.Ct. 1037, 1 L.Ed.2d 1034 (1957), the state contended that its civil service law, and not the employees' collective bargaining agreement, governed the wages and working conditions of a railroad. The Court held that the RLA applied to the railroad and that:

> "Under the Railway Labor Act, not only would the employees of the Belt Railroad have a federally protected right to bargain collectively with their employer, but the terms of the collective-bargaining agreement that they have negotiated with the Belt Railroad would take precedence over conflicting provisions of the state civil service laws."

*Id.* at 561, 77 S.Ct. at 1042 (footnote omitted). In *Local 24, International Brotherhood of Teamsters v. Oliver*, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959), the state of Ohio enjoined implementation of a collectively bargained agreement governing a wage scale specially adapted to the trucking business. The Supreme Court reversed, holding that the state was precluded from applying its law to prohibit the contracting parties from carrying out the terms of a collectively bargained agreement. The airlines emphasized the following language from the Supreme Court's opinion:

"Federal law here created the duty upon the parties to bargain collectively; Congress has provided for a system of federal law applicable to the agreement the parties made in response to that duty, *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448 [77 S.Ct. 912, 1 L.Ed.2d 972]; and federal law sets some outside limits (not contended to be exceeded here) on what their agreement may provide, see *Allen Bradley Co. v. Local Union*, 325 U.S. 797 [65 S.Ct. 1533, 89 L.Ed. 1939]; cf. *United States v. Employing Plasterers Assn.*, 347 U.S. 186, 190 [74 S.Ct. 452, 454, 98 L.Ed. 618]. We believe that there is no room in this scheme for the application here of this state policy limiting the solutions that the parties' agreement can provide to the problems of wages and working conditions. Cf. *California v. Taylor*, 353 U.S. 553, 566, 567 [77 S.Ct. 1037, 1044, 1045, 1 L.Ed.2d 1034]. Since the federal law operates here, in an area where its authority is paramount, to leave the parties free, the inconsistent application of state law is necessarily outside the power of the State."

*Id.* at 296, 79 S.Ct. at 304. The airlines take the position that, "under the guise of eliminating discrimination", the state here is interfering with terms of a federally mandated collective bargaining agreement which "go to the heart of the economic relationships between labor and management". (Memorandum in Opposition at 71).

*Malone v. White Motor Corp.*, 435 U.S. 497, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978), sets out the general principles governing preemption of state law by federal labor statutes in the context of a pension benefits plan. *Malone* dealt with Minnesota's Private Pension Benefits Protection Act which altered the terms of a collectively bargained pension plan by imposing additional burdens on the employer. The Court noted that "[t]he purpose of Congress is the ultimate touchstone" in determining whether the state law was preempted by the National Labor Relations Act, but that:

"Often Congress does not clearly state in its legislation whether it intends to pre-empt state laws; and in such instances, the courts normally sustain local regulation of the same subject matter unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States. *Ray v. Atlantic Richfield Co.*, ante, [435 U.S. 151] at 157–158 [98 S.Ct. 988, 55 L.Ed.2d 179]; *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 540–41 [97 S.Ct. 1305, 1309, 1317, 51 L.Ed.2d 604] (1977); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447] (1947)."

*Id.* at 504, 98 S.Ct. at 1190.

Moreover, *Garmon* and *Lodge 76* recognized exceptions to federal preemption of state law in the field of labor relations. States may enact legislation which affects the terms of a collective bargaining agreement where:

1. the conduct regulated by the state touches interests "so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, [a court] could not infer that Congress had deprived the States of the power to act," *Garmon, supra*, 359 U.S. at 244 [79 S.Ct. 773]; or

2. the state regulations pertain to activity that is "a merely peripheral concern" of federal labor policy, *Lodge 76, supra*, 427 U.S. at 137 [96 S.Ct. 2548]; see *Garmon, supra*, 359 U.S. at 243.

In *Goodyear Tire & Rubber Co. v. Department of Industry, Labor and Human Relations*, 87 Wis.2d 56, 273 N.W.2d 786 (Ct.App. Dist. IV, 1978), the Wisconsin Court of Appeals concluded that elimination of discrimination fell within the "deeply rooted interest exception" to federal preemption. *Goodyear* involved essentially the same issue presented here: whether state anti-discrimination law barred disparate treatment for purposes of an employee benefits plan of disabilities stemming from pregnancy and those resulting from other causes. Goodyear contended, *inter alia*, that the NLRA preempted Wisconsin's anti-

discrimination law insofar as it altered elements of a collective bargaining agreement.

In an analysis fully applicable here, the court held that the state law was not preempted. The court found that:

"Sex discrimination in Wisconsin touches interests deeply rooted in this state. Wisconsin has prohibited sex discrimination in employment since 1961. Wisconsin has promulgated a massive amount of legislation forbidding sex discrimination.

The commitment of this state to elimination of sexual discrimination in employment prohibits us, 'in the absence of compelling congressional direction,' [*Garmon*], 359 U.S. at 244, 79 S.Ct. [773] at 779, from inferring that Congress has deprived this state of the power to act when a collective bargaining agreement, subject to the NLRA, conflicts with Wisconsin policy on sex."

*Id.* at 81, 273 N.W.2d at 799 (footnotes omitted). The court concluded that the Wisconsin statute did not frustrate the intent and purposes of federal labor law. Conceding that federal law did not (at that time) invalidate Goodyear's plan, *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), the court held that the state was permitted to grant greater protection to women than the federal government, because the Wisconsin law was not preempted.

New York's interest in eliminating sex discrimination is at least as deeply rooted as Wisconsin's, and the amendments to the DBL designed to ensure coverage in employee benefit plans for pregnancy related disabilities no more frustrate the intent and purposes of federal labor law than the similar provisions of the Wisconsin statute. Adopting the reasoning of the *Goodyear* court in this regard, we conclude that application of the DBL in this case is not preempted by the Railway Labor Act.

*IV. Conflict with Federal Anti-Discrimination Law*

The airlines contend that the provisions of the DBL requiring them to provide coverage in their employee benefit plans for disabilities related to pregnancy conflict with the "equal pay for equal work" provisions of Title VII, the Equal Pay Act of 1963, and Executive Order No. 11246, and are therefore invalid under the supremacy clause. The gist of the airlines' argument is that to provide coverage for pregnancy related disabilities is to compensate women as a class more than men as a class, which, according to the airlines, is to discriminate against male employees "on the basis of sex."

The airlines rely principally on the Supreme Court's decision in *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). There the court held that employee benefit plans that exclude pregnancy related disabilities from coverage do not violate Title VII. It does not follow, however, as the airlines contend, that plans that include coverage for pregnancy related disabilities do violate Title VII. That the statute does not require coverage does not mean that it forbids it.

The Supreme Court has never adopted the view that an employment practice is illegal *simply* because it benefits members of one sex more than members of the other. Title VII forbids discrimination on the basis of "gender as such"—that is, it forbids an employer from dividing employees into two classes, the class of male employees and the class of female employees, and treating those two classes differently with respect to "compensation, terms, conditions, or privileges of employment" (unless the employer can establish that in the circumstances sex is a "bona fide occupational qualification"). 42 U.S.C. § 2000e-2. Title VII does *not* forbid an employer from dividing employees into classes on the basis of some other factor, and treating those classes differently, even though the different treatment may fall more heavily on members of one sex than on members of the other, unless the employer's practice is a pretext designed to effect an invidious discrimination against members of one sex or the other. This is so even though the Court has recognized that in some circumstances a showing of "disproportionate impact" creates a presumption of

invalidity that the employer must rebut by demonstrating that the classification involved serves a legitimate function. *See Gilbert, supra,* 429 U.S. at 136–37, 97 S.Ct. 408–09; *Washington v. Davis,* 426 U.S. 229, 246–47, 96 S.Ct. 2040, 2050–51, 48 L.Ed.2d 597 (1976); *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).

Properly characterized, the airlines' argument is one of disproportionate impact. They note that providing coverage for pregnancy related disabilities benefits some women but no men, and argue that this is to discriminate between men and women on the basis of sex. But in *Gilbert, supra,* the Supreme Court rejected just this sort of analysis. In holding that an employer's failure to provide coverage for pregnancy related disabilities was not discrimination "based on sex," the Court, quoting from its earlier opinion in *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974) (rejecting a constitutional challenge to a state employee benefits plan that did not include such coverage), stated:

> " 'While it is true that only women can become pregnant, it does not follow that every legislative classification concerning pregnancy is a sex-based classification . . . . Absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, *lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis,* just as with respect to any other physical condition.' "

429 U.S. at 134–35, 97 S.Ct. at 407 (quoting 417 U.S. at 496 n.20, 94 S.Ct. 2492 n.20) (emphasis added).

The real distinction involved here, as described in *Gilbert* and *Geduldig,* is not that between women and men, but that between pregnant women and nonpregnant persons. It is quite true that the amendments to the DBL benefit "pregnant women" at the expense of "nonpregnant persons" (including many female employees), and it could be argued that this distribution of benefits is unfair to "nonpregnant persons." It is equally true that the amendments benefit women as a class at the expense of men as a class, and it could be argued that this distribution of benefits is unfair to men. But "the question of fairness to various classes affected by the statute is essentially a matter of policy for the legislature to address." *City of Los Angeles Department of Water and Power v. Manhart,* 435 U.S. 702, 709, 98 S.Ct. 1370, 1376, 55 L.Ed.2d 657 (1978). The New York legislature has addressed that question and determined that whatever class inequities may be involved in ensuring coverage for pregnancy related disabilities in employee benefit plans are warranted by the social benefits of such coverage.

The invalidity of the airlines' analysis is confirmed by the decision of the Supreme Court in *City of Los Angeles Department of Water and Power v. Manhart, supra,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), which invalidated the Los Angeles Department of Water and Power's requirement that its female employees make larger contributions to its pension fund than its male employees during the term of their employment, to make up for the fact that women as a class live longer than men, and consequently collect more pension benefits than men following retirement. The Department argued that *not* to require larger contributions from its female employees would violate Title VII because it would require male employees to subsidize the pension benefits of female employees, just as the airlines argue here that *not* to exclude coverage for pregnancy related disabilities would violate Title VII because it would require male employees to subsidize the disability benefits of female employees (though, as indicated above, the actual effect would be to require male employees and female employees who do not become pregnant to subsidize the benefits of those female employees who do become pregnant). However, in *Manhart* the Court rejected the claim that practices that have a "disproportionately heavy impact on male employees" are illegal *per se,* noting that

"[e]ven a completely neutral practice will inevitably have *some* disproportionate impact on one group or another." 435 U.S. at 710 n.20, 98 S.Ct. at 1377 (emphasis in original).

*Manhart* emphasized that Title VII's

"focus on the individual is unambiguous. It precludes treatment of individuals as simply components of a racial, religious, sexual, or national class. . . . [T]he basic policy of the statute requires that we focus on fairness to individuals rather than fairness to classes."

*Id.* at 708–09, 98 S.Ct. at 1375–76.

The fundamental flaw of the airlines' argument that to provide coverage for pregnancy related disabilities would be to discriminate against men is that it focuses on fairness to classes rather than fairness to individuals. When the effects of the amendments to the DBL are analysed in a gender neutral manner, it is clear that no *individual* is compensated more than any other, since each individual's compensation with respect to disability benefits is simply that individual's *pro rata* share of the total cost of the benefits program. The airlines objection that the amount they must pay as insurance premiums for employee benefits coverage will vary depending upon how many women work for them is of no moment. Assuming that this is true, it means only that the more women a company employs the larger will be its contribution on behalf of each employee.

Although this discussion has focused on Title VII, the conclusion that the amendments to the DBL do not require employers to compensate any woman more than any man defeats the airlines' claims under the Equal Pay Act and Executive Order No. 11246 as well. In sum, as a matter of law the DBL amendments do not conflict with federal anti-discrimination laws. Accordingly, that portion of the complaint that seeks a declaration to the effect that they do fails to state a claim upon which relief can be granted.

*V. Conclusion*

We conclude that to the extent that the New York Human Rights Law obliges the airlines to provide full coverage in their employee benefit plans for disabilities related to pregnancy, it is preempted by ERISA; that the provisions of the Disability Benefits Law that require the airlines to provide limited coverage for such disabilities are not preempted by ERISA or the Railway Labor Act; and that those provisions of the Disability Benefits Law do not conflict with federal anti-discrimination laws.

Submit order on notice.